HADLOCK, J.
*400 Defendant was convicted of 12 sex crimes related to the multiple sexual encounters he had with teenaged boys when he was in his late 40s. Defendant's convictions include five counts of using a child in a display of sexually explicit conduct, ORS 163.670, based on defendant having repeatedly induced one of the victims to masturbate while defendant watched. On four of those sexual-display convictions, the trial court sentenced defendant to concurrent 300-month prison terms under ORS 137.690.[1] Defendant challenges those statutorily mandated 300-month prison terms on appeal, arguing that they are unconstitutionally disproportionate as applied to the circumstances of this case.
We recently addressed a similar argument in State v. Carey-Martin , 293 Or. App. 611, 430 P.3d 98 (2018), a case that involved very different facts but which-like this case-included a challenge to a trial court's imposition of concurrent 300-month prison terms for multiple sexual-display convictions. In Carey-Martin , we held that those terms were unconstitutionally disproportionate as applied to a teenaged defendant whose sexual-display convictions were based on "sexting" activity with girls who were only a few years younger than him, and whose convictions for other sex crimes against those victims were based on the girls' ages and attendant incapacity to consent. See id. at 626-29, 430 P.3d 98 (describing the defendant's conduct). Although we found the 300-month terms unconstitutional under those circumstances, we noted the likelihood of "other circumstances where imposing such a sentence for multiple convictions for using a child in a display of sexually explicit conduct * * * would be constitutional." Id. at 643, 430 P.3d 98.
*261 This case presents such circumstances. For reasons that we discuss below, the trial court did not err when it imposed the 300-month prison term required by ORS 137.690 on four of defendant's convictions for using a child in a display of sexually explicit conduct. We reject without *401 discussion each of the other arguments that defendant makes on appeal.[2] Accordingly, we affirm.
Defendant's primary argument on appeal is that the 300-month prison terms imposed in this case violate Article I, section 16, of the Oregon Constitution, which requires that "all penalties shall be proportioned to the offense." Because the constitutionality of a sentence depends on, among other things, case-specific factors "such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim," State v. Rodriguez/Buck , 347 Or. 46, 62, 217 P.3d 659 (2009), we begin by summarizing the circumstances surrounding defendant's sexual-display crimes, as well as the facts about defendant and his victim that were brought out at sentencing. We describe the evidence in the light most favorable to the state. State v. Smith , 277 Or. App. 709, 710, 372 P.3d 549, rev. den. , 360 Or. 423, 383 P.3d 864 (2016).
One of defendant's victims was a 16-year-old boy, G. The boy's mother described him as having had some "mental health issues" and as having "tak[en] up a homeless status," coming and going from his parents' residence as he saw fit. Over the course of about a month, defendant repeatedly provided G with alcohol, masturbated in front of him, then asked G to masturbate while defendant watched. Some of those incidents also involved sexual contact between defendant and G. G's description of two of the incidents (as he relayed them to a police officer) is representative:
G told the officer that he had first met defendant at a church-associated café that provides food for people without homes. Nothing sexual happened at that first meeting. About a week later, G and defendant ate dinner together at the café. G told defendant "about his drug and alcohol problem," and, at one point, defendant offered to go buy some *402 alcohol for G. The boy was "creeped out" and tried to leave without defendant, but defendant ran after him, went into a store, and came out with alcohol. Defendant and G walked behind a business. Defendant told G "that he was feeling very horny and pulled out his penis," then masturbated until he ejaculated. Defendant then unzipped G's pants, pulled out G's penis, and stroked it. Two weeks later, G and defendant again ate dinner together at the café, defendant again provided G with alcohol, and-after they drank the alcohol together-defendant told G that it was "jack time." They masturbated together, then defendant masturbated G until he ejaculated.
Over the following weeks, defendant abused G three more times, once in the bathroom at a fast-food restaurant, once in a courtyard near a garden, and once in the bathroom at a grocery store. At the fast-food restaurant, defendant told G that he would buy G something to drink if G first masturbated together with him. At some point during those later encounters, defendant orally sodomized G and also digitally penetrated G's anus. However, G described defendant's "usual" conduct as what happened in the grocery-store bathroom: defendant started masturbating and asked G to do the same; he then watched G masturbating.
Shortly after the last of those incidents, defendant and G planned to travel to a nearby city to meet a 15-year-old boy so that defendant and that boy could have sex together, then engage in sexual activity with G. By that point, somebody had told police that G was sexually involved with an older man, and police had alerted G's mother. When G told his mother that he was meeting a friend *262 at the library, her "radar went off," so she drove him to the library and dropped him off, but she did not leave immediately. Instead, G's mother watched G enter the library, saw him meet defendant, and then saw G and defendant leave the library together. G's mother called the police, who found and arrested defendant. The boy whom defendant and G had planned to meet subsequently told police officers that he had communicated with defendant and G through email and Facebook. Officers obtained a search warrant for defendant's Facebook account, executed it, and found statements by defendant to that other boy that corroborated the report *403 that the boy, defendant, and G had planned to meet for a sexual encounter. Other conversations on defendant's Facebook account also reflected his sexual interest in teenaged boys.
Based on his conduct against G, defendant was charged with crimes that occurred on five different dates, viz. , two counts of third-degree sexual abuse, three counts of second-degree sexual abuse, and five counts of using a child in a display of sexually explicit conduct, which is a Class A felony. Thus, the indictment alleged that-on each of five pertinent dates-defendant committed an act of sexual abuse against G and also compelled or induced G "to participate in or engage in sexually explicit conduct for a person to observe." The state prosecuted the sexual-display counts on a theory that defendant had violated ORS 163.670 by inducing G to masturbate while defendant watched.[3]
The state also charged defendant with one count of third-degree sexual abuse and one count of second-degree sexual abuse against another victim, T, whom defendant met at a light-rail station when T was 15 or 16 years old. When they first met, defendant bought cigarettes for T because T was too young to do so. Defendant and T exchanged numbers, defendant later contacted T, and the two met to drink alcohol. T became drunk, and he and defendant had "a masturbation conversation." Defendant pulled out his penis and asked T to do the same. Defendant then touched T's penis with his mouth and his hand. Defendant's sexual abuse of T appears to have occurred at least several months before defendant first encountered G.
A jury convicted defendant of all crimes charged against both victims, except that, on one of the charges of second-degree sexual abuse against G, it convicted defendant only of the lesser-included offense of attempted second-degree sexual abuse.
*404 Defendant's five convictions for using a child in a display of sexually explicit conduct triggered sentencing under ORS 137.690. As we explained in Carey-Martin , that statute "imposes a mandatory minimum term of 25 years [300 months] for a person who has been convicted of more than one 'major felony sex crime,' " a term that includes "the crime of using a child in a display of sexually explicit conduct." 293 Or. App. at 613, 430 P.3d 98. Moreover, the statute provides that a "previous conviction" includes "a conviction in the same sentencing proceeding if the conviction is for a separate criminal episode * * *." ORS 137.690(c). Thus, once defendant was convicted of the first count of using a child in a display of sexually explicit conduct, the trial court was required to sentence defendant to 300-month terms of imprisonment on each of the four additional counts of that crime of which he had been convicted.
The trial court did not impose that sentence reflexively, however. Rather, the court ordered a presentence investigation and also considered G's victim-impact statement. The presentence-investigation report shows that defendant has relatively few previous criminal convictions, specifically, a 1993 conviction for failing to perform the duties of a driver, a 1994 conviction for giving liquor to a minor or intoxicated person, and a 2010 conviction for two counts of theft. However, the presentence investigator reported that, although defendant had no prior convictions for sex *263 crimes, "this is not the first attempt by prior victims to report [defendant's] misconduct."
For example, the presentence investigation revealed that defendant was accused in 1997-when he would have been about 34 years old-of pushing down a 16-year-old boy, attempting to feel the boy's genitals through his front and back pants pockets, and grinding his own genitals into the boy's buttocks through his clothes. The defendant reportedly had previously shown pornography to that boy, discussed sex with him, and masturbated in the boy's presence with his hands in his pants. The boy also reported that defendant had offered to buy him alcohol, and that defendant had asked him to bring over his friends for sex; defendant's condition was that the friends needed to be at *405 least 14 years old. The boy's mother reported the incident to police, who interviewed defendant. Defendant acknowledged that the boy had twice visited defendant's home, but denied the other accusations. Defendant was not arrested or prosecuted.
The presentence investigation also indicated that police received a report in 2005 from an Oregon State Hospital patient who said that defendant had recently told the patient that he had molested three teenaged boys and possessed child pornography. The patient also said that, when he was 16 years old, he had himself been orally sodomized by defendant. The patient told police that the abuse continued until he was 18 years old; he also said that defendant had told him that he was still attempting to meet young males in public places. Police again spoke to defendant, who denied any misconduct. Defendant also denied having been accused of sexual misconduct in 1997. Again, defendant was not arrested or prosecuted.
More recently, a teenaged boy under the age of 18 reported that defendant had offered to give him and a friend, N, athletic shoes if the friend would send defendant photographs of his penis; that boy also said that defendant tried to touch the boy's genitals and once asked for oral sex. Police communicated with N. Defendant had contacted N via Facebook, offering him $40 for a photograph of his penis and also offering him alcohol and marijuana. In response to the contact from defendant, N said that he was less than 18 years old. Defendant responded by saying "I know" and asking whether he should wait until N turned 18. Finally, another boy told police that defendant tried to buy him alcohol and offered to pay him money to drink. The boy did not take defendant up on the offer; he felt that defendant was trying to alter his mood so "something" would be more likely to happen.
The presentence investigator also reported her interactions with G's mother and with defendant. G's mother said that G has had ongoing counseling since the incidents with defendant and will need it for many more years. The investigator reported that she found "most disturbing" that defendant expressed doubt that he needed treatment and *406 "has no intention of seeking help of any kind during his upcoming incarceration."[4]
Before sentencing defendant, the trial court also considered a victim-impact statement submitted by G, who described how defendant "took advantage of the fact that [G] had bad emotional problems and wanted someone on the streets to talk to and care about [him] and * * * wanted alcohol" for self-medication. G reported that his emotional problems became "way worse than they were before" defendant abused him. He also described how defendant's crimes led G "to have a strange loyalty to him leading to scenarios like when [G] attempted hooking him up with a 15 year old classmate" and when G threatened his mother with violence when she wanted to give the police some of G's belongings that might have defendant's semen on them.
Notwithstanding those circumstances, defendant argued to the trial court that the mandatory minimum 300-month incarceration *264 terms would be unconstitutionally disproportionate in this case, in part because those terms are longer than the prison terms that the court would impose for defendant "actually engaging in the sexual [conduct] for which" he had been convicted. In response, the state emphasized defendant's repeated abuse of multiple children (both as charged in this case and as described in the presentence investigation report), his choice of vulnerable victims, and G's victim-impact statement. Based on those facts, the state argued, a 300-month prison term would not be unconstitutionally disproportionate. The state also specifically responded to defendant's argument that the 300-month term for four of the sexual-display convictions was unconstitutionally disproportionate because defendant received lesser sentences for his "hands-on" sexual abuse of G:
"[N]one of [the] hands-on sexual offenses would have occurred were it not for the defendant's inducement of [G] to engage *407 in masturbation for him to view. Each of these individual incidents started with the defendant either offering alcohol or offering to purchase food or drinks to otherwise giving [G] things that he had difficulty resisting because of his alcohol problems.
"[Defendant] did all of those things to start-would induce the child to engage in masturbation, and then that would allow the defendant to engage in the hands-on abuse of the child."
The trial court imposed a sentence of 70 months' incarceration on one count of using a child in a display of sexually explicit conduct and imposed the statutorily required 300-month incarceration terms on each of the other four counts of that crime, all to run concurrently. The court imposed shorter sentences for each of the other crimes of which defendant had been convicted, all running concurrent to the 300-month term of incarceration and to each other, except that the court ordered one day on defendant's sentence for second-degree sexual abuse against T to run consecutively to the other sentences.[5] The court explained that it would not have imposed the 300-month terms of incarceration if it were not statutorily required to do so, but it also rejected defendant's argument that the mandatory sentence was unconstitutionally disproportionate.
On appeal, the parties reprise their arguments regarding whether the 300-month terms of incarceration imposed on four of defendant's sexual-display convictions are unconstitutionally disproportionate as applied in the circumstances of this case, in violation of Article I, section 16.[6] Much of the parties' dispute focuses on whether ORS 137.690 -which applies only when a defendant has more than one conviction for a "major felony sex crime"-should *408 be considered a recidivism statute. That matters because the constitutionality of sentences imposed pursuant to true recidivism statutes is analyzed according to principles that depart somewhat from the "standard" proportionality analysis articulated in Rodriguez/Buck . See, e.g. , State v. Althouse , 359 Or. 668, 685-87, 375 P.3d 475 (2016) (setting out analysis that applies for sentences imposed under ORS 137.719(1), which presumptively requires a life sentence for a felony sex crime conviction "if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence").
Carey-Martin resolves that aspect of the parties' dispute. There, we explained that ORS 137.690 cannot be considered a recidivism statute in the traditional sense because, although it applies only when a defendant has multiple convictions for "major felony sex crimes," it "allows a previous conviction to be the predicate conviction even if *265 it is imposed in the same sentencing proceeding." 293 Or. App. at 624, 430 P.3d 98. That is, ORS 137.690 can apply even when a defendant has not previously been punished for other sex crimes in a way that has given him an opportunity to reform. The statute is therefore "less concerned with the goal of protecting the public from recidivist sex criminals, and more concerned with the protection of the public from those persons who have committed the very worst sex crimes more than once." Id. Accordingly-at least when, as here, ORS 137.690 does not operate under the case-specific circumstances as a recidivism statute-the Rodriguez/Buck test governs our analysis of whether the 300-month prison terms it requires are unconstitutionally disproportionate in a particular case. Id. at 626, 430 P.3d 98.
We turn to application of that test. In Rodriguez/Buck , the Supreme Court expanded on foundational principles that it had announced in earlier cases, including that the legislature plays "the central role * * * in establishing penalties for crimes," that Article I, section 16, requires that such penalties must not be "so proportioned to the offense committed as to shock the moral sense" of all reasonable people, and that judicial review of the constitutionality of penalties will "only in rare circumstances" result in a holding of unconstitutional disproportionality. 347 Or. at 57-58, 217 P.3d 659.
*409 In giving content to the "shock the moral sense" standard, the court explained that a proper Article I, section 16, analysis must take into account at least these three factors:
"(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."
Id. at 58, 217 P.3d 659.
Carey-Martin governs our consideration of those three factors in the context of sentences imposed under ORS 137.690 for violations of ORS 163.670, the statute that defines the crime of using a child in a display of sexually explicit conduct. As discussed below, application of the Carey-Martin principles to the facts of this case leads us to conclude that the 300-month prison terms are not unconstitutionally disproportionate here.
The first Rodriguez/Buck factor requires us to compare "the severity of the penalty and the gravity of the crime" of which defendant was convicted. In discussing the first factor, Carey-Martin stressed the extreme severity of a sentence that includes a 300-month prison term. 293 Or. App. at 630, 430 P.3d 98. The same is true here; the concurrent 300-month prison terms that defendant received on four of his sexual-display convictions are among "Oregon's most severe punishments for any crime." Id. at 643, 430 P.3d 98. But we do not consider that severity in a vacuum; rather we compare it to "the gravity of the crime." Rodriguez/Buck , 347 Or. at 58, 217 P.3d 659. In doing so, we "look at the range of conduct prohibited by ORS 163.670"-the sexual-display statute-and we also consider the specific conduct in which defendant engaged, "using case-specific factors such as characteristics of defendant and the victims, the relationship between defendant and the victims, and the harm to the victims." Carey-Martin , 293 Or. App. at 630, 430 P.3d 98. Our goal is "to determine where on the range of prohibited conduct defendant's conduct falls." Id.
Under ORS 163.670, a person commits the crime of using a child in a display of sexually explicit conduct if the person "employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct *410 for any person to observe or to record in a visual setting." So defined, the crime encompasses "a particularly broad range of conduct," the gravest of which, we explained in Carey-Martin , "is the visual recording or the live presentation of a child engaged in sexual acts." 293 Or. App. at 631, 430 P.3d 98. What happened here is a form of what we described as that "gravest conduct"-a "live presentation" of a child's sexual acts. Id. Defendant induced G to masturbate while he watched, often after giving G alcohol or bribing him with other items. Although G's acts were witnessed only by defendant, the child still was subjected to the experience of being "purchased" for the purpose of exposing his most intimate sexual *266 activity to a much older man. Moreover, the record in this case supports an inference that-as the state argued below and the trial court appears to have accepted[7] -defendant induced G to masturbate in front of him as a prelude to, and in facilitation of, the physical sexual abuse that at least sometimes followed. That type of experience can cause deep psychological harm, as G's victim-impact statement illustrates.
In further considering the gravity of defendant's violation of ORS 163.670, it is helpful to contrast defendant's conduct with the conduct at issue in Carey-Martin -the teenaged defendant's requests that other teenagers send him "nude photos that [were] self-produced." 293 Or. App. at 635, 430 P.3d 98. We characterized that kind of "sexting" as different from what one would typically understand as the target of ORS 163.670. We explained that "three salient facts"-considered in combination-demonstrated that the defendant's sexting conduct "was relatively minor when compared to the underlying harm inherent in typical instances of sexually explicit conduct." Id. As discussed below, none of the facts that made the conduct in Carey-Martin less than "typically" grave is present here.
The first fact that we viewed as reducing the gravity of the Carey-Martin defendant's conduct was that the defendant "induced" the victims' sexual display only by asking *411 and encouraging them to send him pictures. Id. We emphasized that a typical violation of ORS 163.670 would involve "more exploitative behavior or abuse." Id. Here, defendant's conduct was plainly exploitive. Defendant did not merely ask G to masturbate for defendant's gratification; rather, defendant pursued G-a vulnerable teenager-at a café that serves the homeless, gave G alcohol after G talked about his drug and alcohol problem, and then persuaded G to display himself masturbating. The inducement here was by no means the type of "common practice" that was at issue in Carey-Martin . 293 Or. App. at 635, 430 P.3d 98. To the contrary, as G himself described it, defendant "preys upon troubled teens."
The second fact we found important in Carey-Martin was that the victims' sexual displays consisted of photographs that they created and sent to the defendant them-selves. The defendant "neither was physically present when the victims made the nude self-portraits nor was he there to direct them to engage in poses or sexual behavior while he recorded them." Id. at 635-36, 430 P.3d 98. The circumstances that were absent in Carey-Martin are present in this case. Here, defendant was physically present when G masturbated, and G engaged in that behavior at his immediate direction. It is one thing for a girl to take a nude self-portrait to send to a teenager whom she thinks of as her boyfriend; she at least has some opportunity to reflect on her actions and choose whether to go forward. The same kind of opportunity is not available to a sometimes-homeless boy who has gone into the bathroom of a fast-food restaurant with a middle-aged man who has promised to buy the boy something to drink if he will display himself masturbating.
Third, in Carey-Martin , we noted that the defendant was only two to four years older than his victims; we distinguished the case from others "involving older adults who request nude images from children." Id. at 636, 430 P.3d 98. Here, of course, defendant was an older adult who did far more than request nude images.
Considered together, the facts that distinguish this case from Carey-Martin also establish that defendant's behavior does not "fall[ ] toward the less serious range of conduct" covered by ORS 163.670. Id. at 621, 430 P.3d 98. To the contrary, *412 defendant's acts of having G masturbate directly in front of him implicate the core concerns that have led us to characterize "live presentations" of children's sexual acts as particularly "grave[ ] conduct." Id. at 631, 430 P.3d 98. The first Rodriguez/Buck factor does not suggest that the sentence is unconstitutionally disproportionate. *267 The second Rodriguez/Buck factor requires us to compare the penalty at issue-300-month terms of incarceration-to the penalties for other related crimes. Defendant points out that he received significantly shorter sentences for his crimes that involved actual sexual contact with the victims than he did for the sexual-display crimes that he committed by having G masturbate in front of him. Defendant also notes that, even had he sodomized a child two years younger than G, Ballot Measure 11 would have mandated a sentence of only 75 months imprisonment. He contends that those comparisons establish that his sentence was unconstitutionally disproportionate. In response, the state asserts that the legislature was entitled to determine-and did determine, by classifying the conduct as a "major felony sex crime"-that inducing a child to perform sexual acts on display is "a form of exploitation and degradation separate and distinct from other forms of sexual abuse, with separate and distinct psychological harms." Because of that, the state suggests, comparing that crime to other, "hands on," crimes is not helpful to the constitutional analysis, as it is difficult "to say definitively that one sort of offense is more reprehensible than another."
The state's argument cannot easily be squared with Carey-Martin . In considering the second Rodriguez/Buck factor, we identified the question as whether the harm caused by the defendant's sexual-display crimes was "of a magnitude so much greater than the harm of engaging in physical sexual activity [with his victims] that it deserves sentences far greater than could be imposed for rape and sodomy by reason of the victims' incapacity to consent" because of age. 293 Or. App. at 640, 430 P.3d 98. The same is true here. Although we can conceive of violations of ORS 163.670 so egregious and wholly destructive of child victims that it would not be surprising for the crimes to be punished more severely than certain physical sex crimes, that is not true *413 in this case, particularly because defendant's crimes did not involve displaying G-either in person or through recorded image-to anybody other than defendant himself. Although defendant's conduct is far more severe than that at issue in Carey-Martin , the second Rodriguez/Buck factor might therefore suggest that the 300-month prison terms are unconstitutionally disproportionate, if that factor were considered in isolation.
Of course, no one factor is determinative in the Rodriguez/Buck analysis, and we proceed to consider the third factor identified in that case-defendant's criminal history. The question is not simply whether defendant has previous convictions for sex crimes. Rather, "[t]raditional understandings of proportionality * * * require us to consider whether a defendant is a repeat offender by considering previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct." Rodriguez/Buck , 347 Or. at 78, 217 P.3d 659. We must also be mindful, however, that a defendant's criminal history is important not for abstract reasons, but that it matters at least in part because of the state's interest in protecting the public "when efforts to reform have failed." Carey-Martin , 293 Or. App. at 641, 430 P.3d 98. Thus, we take into account not only the number of previous offenses and uncharged incidents, but whether the record indicates that a defendant "is incorrigible or that attempts to reform would fail." Id. at 642, 430 P.3d 98. In Carey-Martin , that factor supported a determination of disproportionality. Although we could not ignore the defendant's convictions for physical sex crimes against his victims (in addition to the sexual-display convictions), the defendant "was only 16, 17 and 18 when he committed the offenses against other teenagers," he had never before been involved with the criminal justice system, and there was a "lack of any unsuccessful attempt at rehabilitation." Id.
The circumstances are starkly different here. Defendant was not close in age to his victims; he was more than 30 years older. Defendant had a long history of being accused of sexual predation against young teenaged boys. And defendant had been contacted by police officers at least twice-in 1997 and 2005-about reports that he had engaged in sexual activity with such children. That history amply *414 supports a finding-of the sort that the presentence investigator reached-that defendant had a pattern of *268 "seek[ing] out vulnerable young male victims." It also demonstrates that, despite having repeatedly been confronted with accusations that he was illegally engaging in sex with children, defendant persisted in that behavior, culminating in his sexual abuse of T and the five separate episodes in which he induced G to display himself masturbating and then sexually abused the boy. Finally, after having been prosecuted and convicted for his crimes against T and G at age 50, defendant has indicated that he has no intention of seeking treatment.
In short, despite never having been previously punished for a sex crime, defendant has had other opportunities to understand and reform his many years of criminal behavior, and he has not done so. The record supports a determination that defendant is "is incorrigible" and that "attempts to reform would fail." Carey-Martin , 293 Or. App. at 642, 430 P.3d 98. Accordingly, the third Rodriguez/Buck factor weighs strongly in favor of a conclusion that the 300-month prison terms are not unconstitutionally disproportionate as applied to the circumstances of this case.
Our ultimate decision regarding the constitutionality of the sentence imposed in this case requires taking all three Rodriguez/Buck factors into account. We find the first and third factors most consequential here, as they capture the grossly exploitive nature of defendant's sexual pursuit of teenage boys over a period of at least 15 years, which culminated in defendant's decision to repeatedly induce a particularly vulnerable child to display himself masturbating, in facilitation of additional sexual abuse. In the end, we circle back to the fundamental question before us: Is this one of the rare cases in which Article I, section 16, precludes imposition of the legislatively mandated sentence? Given the severity of defendant's criminal conduct, together with his long history of sexually pursuing, exploiting, and abusing children, the answer to that question is "no."
Affirmed.

We refer to the sentence as a 300-month term as that is what the judgment imposed. ORS 137.690 uses "25 years."

Defendant raises a total of nine assignments of error in the brief filed by his attorney. The first four assignments of error encompass his challenge of the 300-month prison terms that the trial court imposed on four of the sexual-display convictions. In association with his fifth through ninth assignments of error, defendant makes an unpreserved argument that the court should have acquitted him of the five sexual-display counts. We reject those assignments of error without discussion, along with the two assignments of error that defendant raises in a pro se supplemental brief.

ORS 163.670 provides:
"(1) A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording.
"(2) Using a child in a display of sexually explicit conduct is a Class A felony."

When the trial court asked at sentencing whether defendant wished to address the court, defendant asserted broadly that "the [presentence-investigation report] was so distorted and so inaccurate." However, defendant never challenged the accuracy of any specific information included in that report. Nor has defendant suggested that either the trial court or this court is precluded from considering the information in that report in evaluating the constitutionality of his sentence.

Specifically, the court imposed 27-month terms of incarceration on each of the three counts of second-degree sexual abuse, with all but one day of those terms to run concurrent to the 300-month incarceration terms on the sexual-display sentences, one-day concurrent jail terms on each of the three third-degree sexual abuse convictions, and another one-day concurrent jail term on the single conviction for attempted second-degree sexual abuse.

Defendant also asserts that his sentence violates the Eighth Amendment to the United States Constitution, but he does not develop an argument that the sentence could violate the Eighth Amendment even if it does not violate Article I, section 16. Accordingly, we do not further address the Eighth Amendment point.

The state made that point in its sentencing memorandum. The court stated, when it imposed sentence, that it "agree[d] with the State's analysis in the memo, and so * * * for the Court of Appeals that's the legal analysis * * * I'm adopting."