Argued and submitted December 19, 2018; on appeal, affirmed; on cross-appeal, reversed and remanded for resentencing April 15, 2020

## STATE OF OREGON,
*Plaintiff-Respondent,*
*Cross-Appellant,*

*v.*

## JOHN JOSEPH RIDEOUT,
*Defendant-Appellant,*
*Cross-Respondent.*

Marion County Circuit Court
16CR46282;
A164575 (Control), A164556

465 P3d 255

Defendant appeals a judgment of conviction for one count each of first-degree sodomy, ORS 163.405, and first-degree rape, ORS 163.375, against separate victims, raising multiple assignments of error. The state cross-appeals, arguing that the trial court erred when it concluded that the 25-year mandatory minimum sentence under ORS 137.690 for defendant's first-degree sodomy and first-degree rape convictions was unconstitutional to impose on defendant under Article I, section 16, of the Oregon Constitution. *Held*: The Court of Appeals rejected all of defendant's assignments of error without discussion. With regard to the state's cross-appeal, the court concluded that, given the severity of defendant's criminal conduct, together with his history of sexually assaulting vulnerable victims, this was not "one of the rare cases in which Article I, section 16, precludes imposition of the legislatively mandated sentence" of 25 years. *State v. Horseman*, 294 Or App 398, 414, 432 P3d 258 (2018), *rev den*, 364 Or 723 (2019).

On appeal, affirmed; on cross-appeal, reversed and remanded for resentencing.

Thomas M. Hart, Judge.

Neil F. Byl, Deputy Public Defender, argued the cause for appellant-cross-respondent. Also on the opening and answering brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. John Joseph Rideout filed the supplemental brief *pro se*.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent-cross-appellant. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

On appeal, affirmed; on cross-appeal, reversed and remanded for resentencing.

**TOOKEY, J.**

Defendant appeals a judgment of conviction for one count each of first-degree sodomy, ORS 163.405, and first-degree rape, ORS 163.375, against separate victims. We reject all of defendant's assignments of error without discussion, including those raised in his *pro se* and supplemental briefs. The state cross-appeals, arguing that the trial court erred when it concluded that the 25-year mandatory minimum sentence under ORS 137.690 for defendant's first-degree sodomy and first-degree rape convictions was unconstitutional to impose on defendant under Article I, section 16, of the Oregon Constitution.[1] Given the severity of defendant's criminal conduct, together with his history of sexually assaulting vulnerable victims, we conclude that this is not "one of the rare cases in which Article I, section 16, precludes imposition of the legislatively mandated sentence." *State v. Horseman*, 294 Or App 398, 414, 432 P3d 258 (2018), *rev den*, 364 Or 723 (2019). Accordingly, we reverse and remand for resentencing.

## I.   BACKGROUND

"Because the constitutionality of a sentence depends on, among other things, case-specific factors 'such as characteristics of the defendant and the victim, the harm to the victim, and the relationship between the defendant and the victim,'" we begin by summarizing the circumstances underlying defendant's sodomy and rape convictions, "as well as the facts about defendant and his victim[s] that were brought out at sentencing." *Horseman*, 294 Or App at 401 (quoting *State v. Rodriguez/Buck*, 347 Or 46, 62, 217 P3d 659 (2009)). We describe the facts underlying defendant's convictions in the light most favorable to the state. *State v. Smith*, 277 Or App 709, 710, 372 P3d 549, *rev den*, 360 Or 423 (2016).

A.   *Crimes Against S*

When defendant raped S in 2013, S was a 52-year-old widow who supported herself with disability income because she had an injured back and degenerative arthritis.

---

[1] Article I, section 16, provides, in part, that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

After her husband passed away in 2007, S became very involved in her church. In 2012, S met defendant at her church, and she remembers talking to him when they were both working in the church's vegetable garden. Other than that, they "[h]ardly ever" spoke or spent time together, except "[m]aybe [to] sa[y] hello." In June of 2013, S decided to ask defendant if he would like to do some work around her house and, after finishing up some work in the church garden, defendant followed S to her home to take a look at the projects that S needed done.

S showed defendant a piece of furniture that needed to be repaired and some other outside work that she needed done. Defendant agreed to help S with those projects, and then defendant sat down in the kitchen with S, S's roommate, Nichole, and Nichole's boyfriend, Drew. Because it was getting late, and because S thought defendant had been drinking and was impaired, S told defendant that he could sleep on her couch. Drew went home, and Nichole went to bed. S took defendant a blanket and a pillow and said, "We are not having sex. You are just here to sober up until you leave in the morning." S felt the need to make that clear to defendant because of "the way he was talking about the woman that he said he was seeing," and because "he was just somebody [that S] was just going to help out through [her] church." S left defendant on the couch in her living room and went to her bedroom to fall asleep. To help her sleep, S took "a combination of a lot of medications" that help to combat her depression, anxiety, and PTSD.

The next thing that S remembered was defendant standing over the top of her and then getting into her bed. Defendant pinned S's arms down to the bed, got behind her, and penetrated her vagina with his penis. Defendant "smelled really bad," and "[i]t was so disgusting" that S "wanted to throw up." S kept telling defendant to stop, but she could not move and, when she "opened [her] mouth to scream * * * [she] couldn't get anything to come out." S "went somewhere else" mentally to protect herself, which was the same thing that S did as a child when her stepfather would sexually molest her, because her stepfather had told her that, "if [S] went to the police, [S] would be the one arrested, and then [S] would be responsible for [her family] not having

a home to live in because [S] would be the person who ruined it for everybody." Defendant raped S "all night" long and, after several hours, defendant "made himself ejaculate." Defendant left S's home early the next morning.

After defendant was gone, S, visibly shaken, told Nichole what had happened. Nichole asked S if she wanted to call the police, but S told Nichole that "[s]he just wanted to let it go." S also told her pastor and two friends from church what had happened. S did not want to call the police, mostly due to the fears that S's stepfather had instilled in S as a child about reporting sexual abuse. Instead, the pastor and some of the elders from the church confronted defendant the following day about the rape, and defendant was expelled from the church community. Defendant made no further efforts to return to the church to see S.

In the days following the rape, however, defendant did try to call S. S and Nichole were screening the calls and did not answer, so defendant left voice mails. After several calls, Nichole finally answered the phone and, when defendant asked to speak with S, Nichole told defendant "that [S] didn't want to talk to him and that he wasn't supposed to come back over. He wasn't welcome. Not to call." Defendant stopped calling, and S did not hear from defendant for several more years.

After the rape, S's mental health declined. Three weeks after the rape, S saw a physician assistant at a local clinic and S reported that she could not "sleep or focus" or "get anything done." Additionally, because S did not feel safe at home alone, a friend stayed with S for "a few months." Unfortunately, S's depression and anxiety worsened to the point of S becoming suicidal, and S was hospitalized for eight days as a result. Eventually, S was able to better her mental health with counseling and medication and, after she was able to move out of the house where the rape had occurred, S "was doing great."

Nearly three years after defendant raped S, however, S's sense of security in her new home was shattered, and her anxiety worsened, when she received a call from defendant in May of 2016. S described in her testimony what had occurred in that phone call:

"I was almost getting ready for bed. It was just after 12 o'clock. And the phone rang, and I answered it because I thought it was [an] emergency. And he started talking and I thought, well, I knew this person * * * his voice sounded like somebody else I knew.

"And then he kept going, 'You know who I am. Remember me? Joe.'

"And I * * * told him not to call me. And I was so scared, I hung up the phone. I dropped the phone and [I] ended up on the kitchen wall, screaming and crying. And then I passed out. And then I woke up to my dogs licking my face."

Defendant also left S multiple voice mail messages. After telling her pastor and her son "that the bad man found [her] again" and had called her home, S was convinced by them that she needed to call the police and report the rape. After reporting the incident to police, S decided to get a stalking order against defendant.

Around the same time that defendant decided to recontact S in May of 2016, defendant sodomized another victim, T.

B.  *Crimes Against T*

When defendant sodomized T in 2016, T was a 58-year-old widow who supported herself with disability income because she had neck and "back injuries" and other "illnesses" that prevented T from working.[2]

T met defendant in high school, and then reconnected with defendant several decades later on the internet. When T broke up with her boyfriend in Oregon and needed a place to live, T went to stay with a friend in California. Defendant was also living in California at that time, and T and defendant moved in together and started a sexually intimate relationship. After eight months, T needed to return to Oregon to deal with her animals and her belongings, so T broke off her relationship with defendant in March of 2012 and returned to Oregon. The breakup did not go well, and defendant was upset and angry with T for leaving.

---

[2] T suffers from several illnesses, including lupus, fibromyalgia, rheumatoid arthritis, and diabetes.

T moved into an RV on her sister, E's, property. T remained in contact with defendant, but "it was not good" because "[h]e was very angry." A few months later, defendant moved back to Oregon. Although T spoke with defendant on the telephone and they "would sometimes argue," the two remained "completely separated for 18 months." Eventually, T injured herself, and, in 2014, defendant returned to stay in T's RV to help T while she recovered.

After defendant started staying with T at her RV in 2014, T and defendant would get into verbal disputes, oftentimes revolving around defendant's "sexual" and "dirty talk" to T. They maintained a consensual sexual relationship during that time, but what had started as a consensual sexual relationship, eventually became nonconsensual when defendant would "not take 'no' for an answer." T explained that the first time that she "woke up to [defendant] in [her]," she told defendant,

> "[d]o not try to have sex with me when I'm sleeping. Do not just ram yourself into me. I will not tolerate that behavior. I'm on meds that do not let *** me wake up. I don't know what you're doing *** when you do that. That's not right to me. I won't put up with it."

T thought that defendant understood, and defendant left for the time being.

Another night, T awoke to find that defendant was having sex with her again while she slept. Defendant then proposed marriage to T, which she declined. The next morning, T awoke to find that defendant was behind her, "had rammed himself in [T], rolled [her] over, and was ripping [her] hair" pulling T backwards. T could not fight defendant because of her neck injuries. E heard "blood-curdling screaming" coming from T's RV so she pounded on the door and threatened to chop it down with an axe. When defendant opened the door, T was "screaming for him to get the hell out." Defendant left after E threatened to call 9-1-1, but not before telling E, "if I can't have your sister, then no one will."[3]

---

[3] Defendant was not charged for those incidents in this case.

Although T "felt better" once defendant was gone, she was still "very distraught" because she did not "believe that [defendant] would do that to [her], ever." During T's relationship with defendant, E also noticed "[c]onsiderable changes" in T's demeanor. Specifically, E observed that T "wasn't changing her clothes, she wasn't showering. She wasn't taking care of herself. She was depressed." About two weeks after the altercation with defendant, E noticed that T "would not take off [her] stocking cap" or bathe, and "wouldn't change her clothes." E got T to remove the stocking cap and, at that point, T disclosed that she had been sexually assaulted by defendant. E asked T if she wanted to call the police, but T decided not to because "she was scared for her life if she did."

After that incident, T did not stay in a relationship with defendant, but they "spoke once in a while on the phone" because T "didn't want any problems." Then T's RV burned down, along with E's home, and all of T's possessions. With nowhere to turn and no place to live, T called defendant and moved into defendant's trailer, which was on his mother's property. T was "emotionally distraught" from "the fire and the [uncharged] rape," but T resumed her sexual relationship with defendant. T explained that she had used marijuana to "tolerate the sex with him," because T "felt bad about [her]self" and felt "trapped."

One night in May of 2016, after smoking some marijuana and taking her medication to help her sleep, T awoke to a "painful" sensation and realized that defendant was inserting his penis in her anus. T was able to get up and go into another room. T "felt damaged and worse than [she] had ever in [her] whole life." T waited for defendant to go to work, and then called E to come and get her. T moved back into an RV on E's property.

Three or four days later, T "broke down" and told one of the women who worked on E's property about what defendant had done. That woman told E, and then T reported the incident to police. After the sexual assaults by defendant, T started having nightmares and could not perform daily tasks because she was "terrified" to go anywhere and "hide[s] in [her] house."

C.  *Procedural History*

Based on his conduct against S in 2013, defendant was charged with one count of first-degree rape. The state prosecuted the rape count on a theory that defendant had violated ORS 163.375(1)(a) by forcibly compelling S to have sexual intercourse. The state also charged defendant with first-degree sodomy, based on his conduct against T in 2016. The state prosecuted the sodomy count on a theory that defendant had violated ORS 163.405(1)(d) by engaging in anal intercourse with T while she was sleeping and, thus, was physically helpless. A jury convicted defendant of both counts.

Defendant's first-degree rape and sodomy convictions triggered the mandatory sentencing provisions of ORS 137.690. As we explained in *State v. Carey-Martin*, 293 Or App 611, 613, 430 P3d 98 (2018), that statute "imposes a mandatory minimum term of 25 years [(300-months)] for a person who has been convicted of more than one 'major felony sex crime.'" The term "major felony sex crime" is defined to include first-degree rape and first-degree sodomy. ORS 137.690(b). Moreover, that statute provides that a "previous conviction" includes "a conviction in the same sentencing proceeding if the conviction is for a separate criminal episode ***." ORS 137.690(c). Here, there is no dispute that defendant was convicted of two "major felony sex crime[s]" that arose from "separate criminal episode[s]" and, therefore, the trial court was required to sentence defendant to a "mandatory minimum term of 25 years," unless that sentence was constitutionally disproportionate. ORS 137.690.

The state argued that the court should impose the mandatory 100-month sentence for defendant's first-degree sodomy conviction under ORS 137.700, which also constituted a "major felony sex crime" under ORS 137.690. Furthermore, because defendant was also convicted of first-degree rape, which is another "major felony sex crime," the state argued that the court was required to impose the mandatory minimum 300-month sentence for the rape conviction under ORS 137.690, and that that sentence should be served consecutively to defendant's 100-month sentence for the

sodomy conviction. Defendant argued that the 300-month mandatory minimum sentence would be unconstitutional to impose on defendant under Article I, section 16, based on the principles articulated by the court in *Rodriguez/Buck*, 347 Or 46. Defendant contended that, under *Rodriguez/Buck*, he should be sentenced under the guidelines or, in the alternative, sentenced to "treatment without further incarceration."

The trial court concluded, based on defendant's argument under Article I, section 16, and *Rodriguez/Buck*, that "it is excessive to go to 300[-months] under the citations concerning this defendant, these victims, and the facts before this court." Accordingly, the court declined to impose the mandatory minimum 300-month sentence for defendant's rape conviction under ORS 137.690. Instead, the court concluded that a constitutionally proportionate sentence would be the mandatory minimum 100-month sentence required for each conviction of first-degree rape and first-degree sodomy under ORS 137.700. The trial court imposed those 100-month sentences consecutively, stating that a 200-month sentence "is appropriate under the law" because of "the facts that were revealed in court in the last three days. Two women, unknown to each other, both vulnerable, taken advantage [of] by [defendant]."

## II.   ANALYSIS

### A.   *Applicable Law*

On appeal, the parties reprise their arguments regarding whether the 300-month term of incarceration under ORS 137.690 would be constitutionally disproportionate as applied in the circumstances of this case, in violation of Article I, section 16. Because defendant's predicate convictions for the mandatory minimum 300-month sentence under ORS 137.690 resulted from the same trial, and because defendant "has not previously been punished for other sex crimes in a way that has given him an opportunity to reform," *Horseman*, 294 Or App at 408, "ORS 137.690 does not operate as a recidivist statute in this case *** and *** we apply the test set out in *Rodriguez/Buck*." *Carey-Martin*, 293 Or App at 626. *Cf. State v. Althouse*, 359 Or 668, 685-87,

375 P3d 475 (2016) (setting out analysis that applies for sentences imposed under ORS 137.719(1), which presumptively requires a life sentence for a felony sex crime conviction "if the defendant has been sentenced for sex crimes that are felonies at least two times prior to the current sentence").

In *Rodriguez/Buck*, the Supreme Court expounded on foundational principles that it had announced in earlier cases, including that Article I, section 16, requires that penalties must not "shock the moral sense" of all reasonable people, and that judicial review of the constitutionality of penalties will "only in rare circumstances" result in a holding of unconstitutional disproportionality. 347 Or at 57-58 (internal quotation marks omitted). The court explained that a proper Article I, section 16, analysis must consider at least these three factors:

> "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant."

*Id.* at 58.

In *Carey-Martin*, 293 Or App 611, and *Horseman*, 294 Or App 398, we applied the *Rodriguez/Buck* factors to decide similar constitutional challenges to a trial court's imposition of a 300-month prison term under ORS 137.690 for multiple convictions for using a child in a display of sexually explicit conduct, ORS 163.670. We only briefly discuss the facts and holdings from those cases at this point because we discuss the application of the *Rodriguez/Buck* factors in those cases more fully in our analysis below.

In *Carey-Martin*, we held that the 300-month prison term was unconstitutionally disproportionate as applied to a teenaged defendant whose sexual-display convictions were based on "sexting" activity with girls who were only a few years younger than him, and whose convictions for other sex crimes against those victims were based on the girls' ages and attendant incapacity to consent. *Carey-Martin*, 293 Or App at 626-29 (describing the defendant's conduct). Although we concluded that a 300-month term of imprisonment is

unconstitutional under those circumstances, we noted the likelihood of "other circumstances where imposing such a sentence for multiple convictions for using a child in a display of sexually explicit conduct \*\*\* would be constitutional." *Id.* at 643.

In *Horseman*, we reached the opposite conclusion regarding a defendant that received a mandatory 300-month sentence under ORS 137.690 after he was "convicted of 12 sex crimes related to the multiple sexual encounters he had with teenaged boys when he was in his late 40s," including "five counts of using a child in a display of sexually explicit conduct \*\*\* based on defendant having repeatedly induced one of the victims to masturbate while defendant watched." 294 Or App at 400. After we contrasted the defendant's conduct in *Horseman* with the conduct at issue in *Carey-Martin*, we concluded that the 300-month sentence was not unconstitutionally disproportionate. *Id.* at 414.

As we explain below, the circumstances of this case more closely resemble the "grossly exploitive nature of [the] defendant's sexual pursuit of \*\*\* particularly vulnerable" victims in *Horseman*, and an analysis of the three *Rodrigez/ Buck* factors in this case also leads to the conclusion that this is not "one of the rare cases in which Article I, section 16, precludes imposition of the legislatively mandated sentence." *Id.*

B.  *Consideration of the* Rodriguez/Buck *Factors*

1.  *The severity of the penalty and gravity of the crime*

We begin our analysis with the first *Rodriguez/ Buck* factor—"a comparison of the severity of the penalty and the gravity of the crime"—by examining the severity of the penalty. 347 Or at 58. "As to the relevant penalty, in contemporary criminal justice systems, including Oregon's, the primary determinant of the severity of a penalty is the amount of time that the wrongdoer must spend in prison or jail, if convicted of that offense." *Id.* at 60.

As we observed in *Carey-Martin*, the mandatory minimum 300-month prison term that defendant would have received under ORS 137.690 as a result of his

convictions for first-degree rape and first-degree sodomy is among "Oregon's most severe punishments for any crime." 293 Or App at 643. However, when viewed in the context of the specific conduct at issue here, the 300-month sentence under ORS 137.690 is not so disproportionate as to "shock the moral sense of all reasonable people." *Rodriguez/Buck*, 347 Or at 54. Accordingly, we turn to our examination of the gravity of the offense, and its relationship to the severity of the crime, because "we do not consider that severity in a vacuum; rather we compare it to the gravity of the crime[s]" and, in doing so, we look at the range of conduct prohibited by ORS 163.405 and ORS 163.375—the first-degree sodomy and first-degree rape statutes—because those were the major felony sex crimes that triggered the application of ORS 137.690 in this case. *Horseman*, 294 Or App at 409 (internal quotation marks omitted). Furthermore, when we compare the severity of the penalty to the gravity of the crimes, "we also consider the *specific* conduct in which defendant engaged, using case specific factors such as characteristics of defendant and the victims, the relationship between defendant and the victims, and the harm to the victims." *Id*. (emphasis in original; internal quotation marks omitted).

Under ORS 163.375, a person commits the crime of first-degree rape when that person "has sexual intercourse with another person," and, under ORS 163.405, a person commits the crime of first-degree sodomy when that person "engages in oral or anal sexual intercourse with another person or causes another to engage in oral or anal sexual intercourse," if the victim is "subjected to forcible compulsion by the actor," is "under 12 years of age," is "under 16 years of age and is the actor's brother or sister, of the whole or half blood, the son or daughter of the actor or the son or daughter of the actor's spouse" or is "incapable of consent by reason of mental defect, mental incapacitation or physical helplessness." Unlike the first-degree sexual abuse statute at issue in *Rodriguez/Buck*, which criminalized a "broad range of conduct," 347 Or at 69, the crimes of first-degree rape and first-degree sodomy both encompass far more specific conduct—*viz*., "sexual intercourse" for first-degree rape and "oral or anal sexual intercourse" for first-degree sodomy, and defendant's conduct falls squarely within what

constitutes those forms of intercourse.[4] Moreover, the specific circumstances that made defendant's conduct of engaging in vaginal and anal intercourse unlawful—forcibly compelling S to engage in sexual intercourse and engaging in anal sexual intercourse with T while she was physically helpless—is, for the reasons expressed below, as grave as any of the other attendant circumstances listed in ORS 163.375 and ORS 163.405, and defendant does not contend otherwise. Indeed, defendant acknowledges that "they are serious crimes."

Because of the "physical and sexual content, invasion of the body of the victim[s], and *** psychological impact [of defendant's crimes]," *Rodriguez/Buck*, 347 Or at 76, the conduct underlying defendant's convictions in this case falls on the more serious side of the criminal conduct triggering the mandatory 300-month sentence under ORS 137.690. *See id.* at 75-76 (observing that one defendant's conduct of momentarily touching a child's head with her clothed breasts and the other defendant's conduct of momentarily touching a child's clothed buttocks was less serious than the conduct "constituting second-degree sodomy, second-degree rape, and second-degree sexual penetration," because of the "physical and sexual content, invasion of the body of the victim, and likely psychological impact [of those crimes], *** even when the victim is over 18"); *Carey-Martin*, 293 Or App at 636-37 (observing that the defendant's conduct of "sexting" that resulted in his predicate convictions for using a child in a display of sexually explicit conduct is "much less severe and harmful to *** victims" than the "offense of rape by forcible compulsion"). The fact that defendant's conduct falls on the more serious side of the spectrum of criminal conduct that triggers the mandatory 300-month sentence under ORS 137.690 further supports our conclusion that

---

[4] ORS 163.405 (2017) criminalized nonconsensual "deviate sexual intercourse," which was defined under ORS 163.305(1) (2017) as "sexual conduct between persons consisting of contact between the sex organs of one person and the mouth or anus of another." The legislature amended ORS 163.405 in 2017 and replaced the phrase "deviate sexual intercourse" with "oral or anal sexual intercourse." Or Laws 2017, ch 318, § 5. We cite the current version of ORS 163.405 because the legislature used the same definition for "oral or anal sexual intercourse" under ORS 163.305 as it had for "deviate sexual intercourse," and, therefore, that amendment does not affect our analysis. Or Laws 2017, ch 318, § 2.

the 300-month sentence would not be disproportionate to impose in this case. Here, defendant forcibly compelled S to engage in sexual intercourse and anally sodomized T while she was sleeping and, thus, physically unable to thwart the sexual assault. That is wholly unlike the "sexting" in *Carey-Martin*, which we observed was "common among teenagers" and "commonly viewed among teenagers as a form of voluntary sexual activity." 293 Or App at 634-35. In this case, defendant's sexual activity with the victims cannot be viewed as a common form of consensual sexual activity.

Moreover, the trial court found that defendant's conduct was aimed at particularly "vulnerable" victims because, in this case, T and S were both in their 50s, widowed, and suffered from physical and psychological ailments that resulted in both T and S receiving disability income. Additionally, both of the incidents occurred after the women had taken medications that would render them less capable of thwarting defendant's sexual assaults, and neither victim had an opportunity to refuse to engage in the conduct. *Compare Carey-Martin*, 293 Or App at 635-36 (noting that the defendant "neither was physically present when the victims made the nude self-portraits nor was he there to direct them to engage in poses or sexual behavior while he recorded them") *with Horseman*, 294 Or App at 411 (observing that, unlike the victims in *Carey-Martin* that had the opportunity to reflect on their actions before choosing to go forward, "[t]he same kind of opportunity is not available to a sometimes-homeless boy who has gone into the bathroom of a fast-food restaurant with a middle-aged man who has promised to buy the boy something to drink if he will display himself masturbating").

Defendant's sexual assaults also caused both T and S "psychological harm." *Id*. at 410. After the rape in 2013, S became suicidal, resulting in her hospitalization, and she had to move out of the house where the rape had occurred and receive counseling and medication before she felt "stable." But defendant shattered S's stability and "threw [S] back to the rape" when defendant called her three years later. That drove S's anxiety "through the roof" and prompted her decision to contact the police and obtain a stalking order against defendant in 2016. T was also traumatized by defendant's

conduct throughout their relationship and was "very distraught" because she did not "believe that [defendant] would do that to [her], ever." As discussed, although T was "still emotionally distraught" from "the fire and the [uncharged] rape" because she could not "believe that [defendant] would do that to [her]," T resumed her sexual relationship with defendant and moved in with him, but she "felt bad about [her]self" and felt "trapped." Defendant exploited T's dire financial circumstances and the loss of her home in the fire to resume his relationship with T, which ultimately provided defendant with the opportunity to sodomize her. And, after defendant sodomized T, T started having nightmares and could not perform daily tasks because she was "terrified" to go anywhere and "hid[] in [her] house." As T explained, she "felt damaged and worse than [she] had ever in [her] whole life." The psychological harm that the victims suffered also indicates that the 300-month sentence under ORS 137.690 is not constitutionally disproportionate to defendant's conduct.

Defendant contends that his "advanced age *** weighs in favor of disproportionality" because "an additional 100 months in prison could very well mean a life sentence for defendant, presenting him with no opportunity to reform." But defendant does not cite any authority for the proposition that his decision to commit multiple sexual assaults as a mature adult in his late 50s, which may result in him spending the rest of his days behind bars, somehow makes his conduct less egregious or makes defendant less culpable for his actions. On this record, defendant's actions cannot be attributed to his age, and defendant does not argue that he had any sort of intellectual disability due to his age. *See State v. Ryan*, 361 Or 602, 625, 396 P3d 867 (2017) (evidence of a defendant's intellectual disability is relevant when "making the proportionality comparison" under "the first *Rodriguez/Buck* factor"); *State v. Allen*, 294 Or App 301, 315-16, 432 P3d 250 (2018) (observing that the "transience of youth justifies a constitutional distinction between permissible punishment for a juvenile and an adult whose crimes are otherwise identical" and remanding for resentencing so the trial court would "have an opportunity to consider the transience of defendant's youth and any concomitant susceptibility to reformation" (internal quotation marks omitted));

*State v. Sokell*, 273 Or App 654, 658, 362 P3d 251 (2015), *aff'd*, 360 Or 392, 380 P3d 975 (2016) (observing that the "defendant was 71 years old at the time of sentencing—a fact that inevitably will *decrease* any differential between the life sentence that defendant received under ORS 137.719 and the otherwise-applicable Measure 11 sentence" (emphasis added)).

When the severity of the 300-month penalty is considered in light of the particular circumstances of this case, the first *Rodriguez/Buck* factor does not suggest that that sentence is unconstitutionally disproportionate.

2.    *Penalties for other related crimes*

Because defendant was convicted of a sex crime, "comparing the conduct constituting the crime and the penalty here to other sex crimes is useful in determining whether the penalty is proportioned to the offense." *Rodriguez/Buck*, 347 Or at 65. In particular, we "consider the penalties imposed for other [sex] crimes that have similar characteristics to the [sex] crime[s] at issue" here. *Id*.

Here defendant's sex crimes involved a physical invasion of the victims' bodies without their consent. Three sex crimes under the criminal code share those similarities, two of which defendant stands convicted of in this case—first-degree rape, ORS 163.375, and first-degree sodomy, ORS 163.405. The third similar sex crime that involves a physical invasion of the victim's body is first-degree unlawful sexual penetration, ORS 163.411.[5] *See State v. Shaw*, 233 Or App 427, 435, 225 P3d 855, *rev den*, 348 Or 415 (2010) (observing that second-degree sodomy, second-degree rape, and second-degree sexual penetration are "related offenses" because "those offenses involve some sexual penetration of the victim"). Under ORS 137.700, all of those crimes yield the same 100-month sentence, except for when those crimes are committed against a child under

---

[5] ORS 163.411 provides that a person commits the crime of first-degree unlawful sexual penetration "if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and" the victim "is subjected to forcible compulsion, is "under 12 years of age," or "incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

12 years of age, and all of those crimes can trigger the application of the mandatory 300-month sentence under ORS 137.690. Thus, a comparison to the penalties for the related crime of first-degree unlawful sexual penetration suggests that the penalties for first-degree rape and first-degree sodomy are proportionate—especially when, as here, defendant committed those physically invasive sexual crimes against two vulnerable victims.

Finally, this is not a case where defendant received a shorter sentence for crimes that involved actual sexual contact with the victims than he did for crimes that did not involve any physical contact whatsoever. *See Horseman*, 294 Or App at 412-13 ("Although we can conceive of violations of [the using a child in a display of sexually explicit conduct statute] *** so egregious and wholly destructive of child victims that it would not be surprising for the crimes to be punished more severely than certain physical sex crimes, that is not true in this case, particularly because defendant's crimes did not involve displaying [the victim]—either in person or through recorded image—to anybody other than defendant himself."); *Carey-Martin*, 293 Or App at 640 ("[W]e *** cannot conclude that the harm of defendant's conduct in requesting sexually explicit images is of a magnitude so much greater than the harm of engaging in physical sexual activity that it deserves sentences far greater than could be imposed for rape and sodomy by reason of the victims' incapacity to consent."). Thus, a comparison to the penalties for other related crimes under the second *Rodriguez/Buck* factor indicates that the 300-month sentence under ORS 137.690 for defendant's first-degree rape and first-degree sodomy convictions is proportionate.

3. *Criminal history*

With regard to the third factor—the defendant's criminal history—"[t]raditional understandings of proportionality *** require us to consider whether a defendant is a repeat offender by considering previous criminal convictions and whether there is evidence of multiple instances of uncharged wrongful conduct." *Rodriguez/Buck*, 347 Or at 78. Furthermore, we "take into account not only the number of previous offenses and uncharged incidents, but whether

the record indicates that a defendant is incorrigible or that attempts to reform would fail." *Horseman*, 294 Or App at 413 (internal quotation marks omitted). In *Horseman*, the defendant "had a long history of being accused of sexual predation against young teenaged boys" and "had been contacted by police officers at least twice * * * about reports that he had engaged in sexual activity with such children" and therefore had the opportunity to understand and reform his behavior. *Id*. at 413-14.

Here, there were likewise multiple instances of uncharged conduct by defendant, and defendant persisted in committing sexual crimes despite repeatedly having been confronted about that behavior. That is, there were other instances of similar uncharged sexual conduct that defendant committed against T before he sodomized her. As T described in her testimony, defendant would "not take 'no' for an answer" and he "had rammed himself in [T's]" vagina on multiple occasions while T was sleeping. On one of those occasions, T awoke to find that defendant was behind her, "had rammed himself in [T], rolled [her] over, and was ripping [her] hair" pulling T backwards. Defendant continued until E heard "blood-curdling screaming" coming from T's RV and threatened to chop the door down with an axe and call 9-1-1.

Nevertheless, defendant persisted in his wrongful sexual behavior, which ultimately culminated in the charged act of sodomy against T. Defendant committed the charged act of sodomy against T despite having been repeatedly confronted about his violent sexual behavior. As discussed, the first time that defendant raped T while she was sleeping, T told defendant,

> "[d]o not try to have sex with me when I'm sleeping. Do not just ram yourself into me. I will not tolerate that behavior. I'm on meds that do not let me * * * wake up. I don't know what you're doing * * * when you do that. That's not right to me. I won't put up with it."

T thought that defendant understood, and defendant left. Nevertheless, defendant persisted in that behavior and committed the uncharged rape discussed above where defendant violently raped T until E threatened to chop the RV door

down with an axe and call 9-1-1. Moreover, defendant committed violent sexual acts against T after he had already been confronted by Nichole and members of S's church for forcibly raping S in 2013. Finally, even after all of those confrontations about the wrongfulness of his behavior and chances to avoid arrest, defendant called S three years after the rape, which culminated in S finally obtaining a stalking order and contacting the police.

In short, despite the fact that defendant has never been criminally punished before for a sex crime and subjected to formal efforts to reform his behavior, this case involves multiple instances of similar uncharged conduct, and defendant was repeatedly confronted about that behavior and has had multiple opportunities to understand the wrongfulness of his actions. Accordingly, the third *Rodriguez*/*Buck* factor also weighs in favor of a conclusion that the 300-month prison term is not unconstitutionally disproportionate.

## III.   CONCLUSION

In sum, unlike the "sexting" conduct of the teenaged defendant in *Carey-Martin*, conduct which "the voters never intended [ORS 137.690] to include," 293 Or App at 633, "[t]he defendant in the present case * * * is a 'poster child' for this type of legislation." *State v. Meyrovich*, 204 Or App 385, 393, 129 P3d 729, *rev den*, 340 Or 673 (2006). As Judge James observed in his concurrence in *Carey-Martin*, "ORS 137.690, passed by the voters as part of Measure 73, was designed and marketed to the voting public as a measure targeting a small group of offenders described as 'the worst,' 'predators,' 'violent,' 'serial rapists,' and 'serial child pornographers.'" 293 Or App at 672-73 (James, J., concurring). Here, defendant's conduct involved physically invasive violent sexual assaults against two vulnerable victims. Moreover, despite being repeatedly confronted about the wrongfulness of his conduct, defendant persisted in his predatory behavior towards the victims. An application of all three *Rodriguez*/*Buck* factors to the circumstances of this case leads us to conclude that this is not "one of the rare cases in which Article I, section 16, precludes imposition of the legislatively mandated sentence." *Horseman*, 294 Or App at 414. Accordingly, the trial court erred when it concluded that the imposition of the

mandatory 300-month sentence would be unconstitutionally disproportionate under the circumstances of this case. We therefore reverse and remand for resentencing.

On appeal, affirmed; on cross-appeal, reversed and remanded for resentencing.